2002 SD 84

**STATE of South Dakota, Plaintiff and Appellee,**

v.

**Vincente CHAVEZ, Sr., Defendant and Appellant.**

No. 22087.

Supreme Court of South Dakota.

Considered on Briefs May 28, 2002.

Decided July 17, 2002.

Rehearing Denied Aug. 13, 2002.

Mark Barnett, Attorney General, Gary Campbell, Assistant Attorney General, Pierre, South Dakota, Attorneys for plaintiff and appellee.

Patrick J. Kane, Sioux Falls, South Dakota, Attorney for defendant and appellant.

AMUNDSON, Justice.

[¶ 1.] Vincente Chavez, Sr., (Chavez) was convicted of six counts of aggravated assault and two counts of commission of a felony with a firearm. He appeals. We affirm in part, and remand for sentence corrections.

## FACTS

[¶ 2.] During the night of November 12, 2000, Sioux Falls police were called to investigate a robbery. Victims of the crime reported that they knew the men who had robbed them as "Clown," (later found to be Gregory Iboy (Iboy)), Sandy (later found to be Sandy Rodriguez (Rodriquez)), and "Downer" (later found to be Vincente Chavez, Jr., Appellant/Defendant Chavez's son) (Vincent, Jr.). The victims further reported that one of the men was armed with a .25 caliber handgun and that one victim had been hit in the side of the head with the gun. The victims also stat-

ed that many items had been stolen, including a 12–gauge shotgun. They told police where Vincent, Jr. lived, which was on Franklin Avenue in Sioux Falls in Chavez's home. Iboy was Vincent, Jr.'s, friend and he, too, was staying at the Chavez home. Vincent, Jr., however, was in jail at the time of the robbery and police were aware of this fact.

[¶ 3.] A vehicle that Rodriguez was in was stopped later that night and police found that he possessed some of the stolen items. After confirming with the victims that the items were theirs, police interviewed Rodriguez, and he gave them reason to believe that other stolen items were being stored at Chavez's home where Iboy was staying.

[¶ 4.] That same night, police applied for and received a search warrant for the Chavez home that could be executed at any time on a no-knock basis. Sergeant Richard Miller (Miller), the Special Weapons and Tactics (SWAT) Team advisor assisted in executing the warrant because violence had been used during the robbery, and because the suspects had allegedly been involved in gang activity and narcotics. Miller determined that the SWAT Team should use a "dynamic" approach, whereby the team approaches the house without notice and secures the scene. Miller thought this was necessary because it would be less dangerous to surrounding residents and would prevent a possible hostage situation.

[¶ 5.] In the early morning hours of November 13, 2000, the SWAT Team approached Chavez's home, and rammed open the front door. The Team then announced, "Police Department. Search warrant." The SWAT Team split up once inside the home and one group went to search the second floor. Once upstairs, they encountered Reynala Chavez (Reyna-

la), Chavez's wife who did not speak English. They coaxed her into getting down on the floor and lying flat while they proceeded. When Officer Chris Pearson (Pearson) and Officer Tim Hagen (Hagen) approached Chavez's bedroom door, they discovered it was closed. Hagen tried to push it open, but felt resistance against it. Hagen pushed the door part way open and saw a gun pointed at them. Hagen called out, "gun," and yelled for the man behind the door, Chavez, to drop it. Instead, the officers alleged, Chavez began constricting his finger on the trigger. Hagen dropped to the floor and fired his P–90[1] towards Chavez. Pearson, who had backed away from the door, did the same. Detective Clark Baker, who was outside of Chavez's home during the SWAT Team's warrant execution, claims one single shot, Chavez's handgun, was fired before the P–90 rounds went off. After the gunfire ceased, Chavez came out from behind the door, no longer holding his gun, and the officers saw that he had been injured by the gunfire. His upper right arm and left hand had both been hit with bullets and were bleeding. Chavez, who did speak English, was ordered down on the floor and he complied. He was then taken to the hospital by ambulance.

[¶ 6.] Chavez later acknowledged that Iboy, who was involved in the robbery, was in fact staying at his home. Iboy came into Chavez's home with some friend at about 10:30 on the night of the reported robbery; the group had two rifles and a shotgun, and were carrying property that they admitted had been robbed from someone. Chavez stated that Iboy had a .25 automatic pistol, and that he bragged about how he had hit a robbery victim in the head with it. Chavez claimed that he was very angry at Iboy, and that he told Iboy to get rid of the stolen items. He also stated that he took the handgun from Iboy and that Reynala later placed it in her bedroom closet. Chavez further asserted that when he woke up to his wife's screams, he grabbed the handgun from the cabinet in his bedroom because he feared Iboy's robbery victims were seeking revenge. He also claimed that he had pointed the gun out the bedroom door only to shoot at the ceiling as a means of getting the intruders' attention. He said that once he heard officers yell for him to drop the gun, he pulled it back, yelling "okay" and "I'm sorry." According to Chavez, all of his actions were done before he realized the people in his home were police. He claims that he never heard the officers identifying themselves as police with a search warrant as they came through the house.[2]

[¶ 7.] Regardless of his assertions of innocent confusion, he was indicted on eight criminal counts for firing a gun at Officers Hagen and Pearson, who approached his bedroom door during the execution of the search warrant. The charges

1. A P–90 is a defense weapon. The rounds of ammunition used in a P–90 are light weight, and lose energy when they hit something so that "instead of having the point of the bullet drilling through wall, after wall, when it hits the next wall ... it doesn't have the point to get it through the next wall." This prevents the bullets from going places officers do not want them to go.

2. Chavez presented some evidence at trial that it was difficult for him to comprehend what was going on the night the police executed the warrant because: 1) he was groggy when he awoke; 2) he was taking medication (Darvocet and Indocin); and 3) he had a few alcoholic drinks earlier that day. This, his expert alleged, could have caused confusion and sedation, and "could adversely have affected his ability to interpret the events that were going on." The State, however, presented evidence that Chavez was not legally drunk and had a very low blood alcohol level, less than ten milligrams per deciliter.

included: two counts of aggravated assault for attempting to cause bodily injury with a dangerous weapon under SDCL 22–18–1.1(2); two counts of aggravated assault for attempting to cause bodily injury to the two law enforcement officers, under SDCL 22–18–1.1(3); two counts of aggravated assault for attempting, "by physical menace with a deadly weapon to put others in fear of imminent serious bodily harm" under SDCL 22–18–1.1(5); and two counts of committing or attempting to commit a felony while armed with a firearm under SDCL 22–14–12.

[¶ 8.] Before trial, Chavez made a motion to dismiss the indictment on the grounds that multiple counts were wrongfully being charged, but the trial court denied the motion. After a jury trial, Chavez was convicted of six counts of aggravated assault and two counts of commission of a felony with a firearm. The State requested that the trial court impose two fifteen-year sentences for two counts of aggravated assault against a law enforcement officer. The State also requested the mandatory minimum of five years for the first conviction of commission of a felony with a firearm, and the mandatory minimum of ten years for the second conviction of commission of a felony with a firearm. After the sentencing hearing, the trial judge imposed concurrent fifteen-year sentences for each one of the six aggravated assault convictions, and two concurrent fifteen-year sentences for the armed felony counts, to be served consecutively with the sentences for the assault.[3]

[¶ 9.] Chavez appeals the following issues:

1) **Whether the defendant was improperly charged and convicted on multiple criminal counts.**

2) **Whether the evidence was sufficient to sustain the defendant's convictions.**

3) **Whether the trial court erred by allowing the defendant only partial access to police manuals.**

4) **Whether the trial court erred in setting bail.**

5) **Whether the trial court erred in admitting photographs of a police reenactment of the crime scene.**

6) **Whether the trial court erred in its instructions to the jury.**

### STANDARD OF REVIEW

[¶ 10.] The issues regarding multiplicity of charges are questions of law, which we review de novo. *State v. Blakey,* 2001 SD 129, ¶ 5, 635 N.W.2d 748, 750. On the sufficiency of the evidence issue, we determine "whether there is sufficient evidence in the record which, if believed by the jury, is sufficient to sustain a finding of guilt beyond a reasonable doubt; in making this determination, the court will accept the evidence, and the most favorable inferences fairly drawn therefrom, which will support the verdict." *State v. Gonzalez,* 2001 SD 47, ¶ 7, 624 N.W.2d 836, 838 (citation omitted). Issues regarding the trial court's decision on evidentiary matters are reviewed under the

---

**3.** The following was the State's request made at the time of the sentencing hearing:

This state is asking that you impose 15 years in the South Dakota State Penitentiary for each count of aggravated assault on a law enforcement officer and that would be counts 3 and 4. The State is also asking that you impose the mandatory minimum, 5 years, for the first conviction of a commission of a felo- ny while armed with a firearm, count 7 in the indictment. And the State is also asking that you impose the mandatory minimum of 10 years for a second conviction of the commission of a felony while armed with firearm, count 8 in the indictment. And the State is asking that these sentences run consecutive. In the State's opinion, Your Honor, this is a fair and just sentence.

abuse of discretion standard. *State v. Machmuller*, 2001 SD 82, ¶ 9, 630 N.W.2d 495, 498. "An abuse of discretion is 'discretion exercised to an end or purpose not justified by, and clearly against, reason and evidence.'" *Id.* (citations omitted). We do not ask "whether we would have made the same ruling, but whether we believe a judicial mind, in view of the law and the circumstances, could have reasonably reached the same conclusion." *Id.* (citations omitted). The issue regarding bail is also reviewed under the abuse of discretion standard. *State v. Stuck*, 434 N.W.2d 43, 52 (S.D.1988).

## DECISION

[¶ 11.]  1)  **Whether the defendant was improperly charged and convicted on multiple criminal counts.**

[¶ 12.]  Chavez contends that the commission of a felony with a firearm conviction under SDCL 22–14–12 is prohibited by SDCL 22–14–14. He additionally argues that he was wrongly charged with multiple crimes based on the fact that all eight charges stemmed from the same set of facts.

[¶ 13.]  First, we address whether a conviction under SDCL 22–14–12 is prohibited by SDCL 22–14–14. SDCL 22–14–12 reads, in part, as follows: "Any person who commits or attempts to commit any felony when armed with a firearm, including a machine gun or short shotgun, is guilty of a Class 2 felony for the first conviction. A second or subsequent conviction is a Class 1 felony...." SDCL 22–14–14 states, in pertinent part, that "[n]o offense may be charged under [§ 22–14–12] when the use of a dangerous weapon is a necessary element of the principal felony alleged to have been committed or attempted." SDCL 22–14–14 avers that if a necessary element of the underlying felony

for the charge of commission of a felony with a firearm under SDCL 22–14–12 requires a firearm, there cannot be a separate conviction for commission of a felony while armed with a firearm. "SDCL 22–14–13 is an enhancement statute designed to discourage firearm use and decrease the probability of serious bodily harm to felony victims." *State v. Simons*, 313 N.W.2d 465, 467 (S.D.1981) (finding that use of a weapon is not a necessary element of homicide). One "caveat" preventing a conviction for commission of a felony with a firearm under SDCL 22–14–14 is that a "dangerous weapon" must not be a "necessary element of a principal felony." *Id.* at 468.

[¶ 14.]  Under  22–18–1.1(3), "[a]ny person who ... [a]ttempts to cause or knowingly causes any bodily injury to a law enforcement officer or other public officer engaged in the performance of the officer's duties ... is guilty of aggravated assault." This subsection does not require or mention the use of a deadly weapon. Therefore, a conviction of aggravated assault under subsection 3 of SDCL 22–18–1.1, as well as a conviction of commission of a felony while armed, is not a statutory violation of SDCL 22–14–14. Nor is it a violation of double jeopardy. *State v. Corle*, 294 N.W.2d 799, 800 (S.D.1980) (per curiam) (stating one transaction leading to charges of a commission of a felony while armed and aggravated assault under SDCL 22–18–1.1(3) will not violate double jeopardy because a conviction of each requires different elements be met).

[¶ 15.]  Additionally, Chavez argues charging him with multiple counts of the same crime was error based on the fact that all of the charges arose from same set of facts. We acknowledge that if there is a single transaction resulting in more than one crime, each crime must have been the result of "separate factual

incidents." *State v. Well*, 2000 SD 156, ¶ 21, 620 N.W.2d 192, 196. "[A] defendant cannot receive two convictions for one crime unless the [L]egislature intended multiple punishments." *Id.* at ¶ 23.

[¶ 16.] Here, the State concedes in its brief that the trial court should have only entered 2 convictions and sentences for aggravated assault, rather than 6. SDCL 22–18–1.1 enumerates the different ways of committing aggravated assault. The methods of committing this crime pertinent to this case include: attempting to cause bodily injury with a dangerous weapon; attempting to cause bodily injury to a public officer performing his duties; attempting by "physical menace with a deadly weapon to put another in fear of imminent bodily harm[.]" SDCL 22–18–1.1(2), (3) and (5). "[W]hen a penal statute mentions several acts disjunctively, and prescribes that each shall constitute the *same offense* and is subject to the same punishment, an information may charge any and all such acts conjunctively as constituting a single offense." *State v. Baker*, 440 N.W.2d 284, 293 (S.D.1989) (citing *State v. Likness*, 386 N.W.2d 42, 43 (S.D.1986) (emphasis in original)). It is not, however, permissible to punish a defendant more than once for one offense in violation of a single statute. We have held that "SDCL 22–18–1.1 does not contain four separate offenses, but rather describes one violation that may be established in four different ways.... Each of the counts describes a different method of accomplishing the offense, but there was only one offense committed...." *Id.*

[¶ 17.] We have acknowledged that two convictions for the same crime cannot stand without specific legislation to that effect. *Well*, 2000 SD 156 at ¶ 23, 620 N.W.2d at 197. Therefore, for example, "double homicide convictions for a single death are improper" and "a single plan to steal numerous cattle was a single theft absent evidence that the defendant had a separate intent or plan." *Id.* at ¶ 23. "Without two separate factual incidents or statutorily intended multiple punishments for the same facts, two convictions cannot stand." *Id.*

[¶ 18.] In this case, it is permissible to convict and sentence Chavez for one count of aggravated assault as to each officer he assaulted, but he cannot be punished more than once for identical facts under varying subsections of the aggravated assault statute. *See State v. Seidschlaw*, 304 N.W.2d 102, 106 (S.D.1981). Here, Chavez can be convicted and sentenced for one count of aggravated assault against Hagen. He can also be convicted and sentenced of one count of aggravated assault as to Pearson. The remaining four aggravated assault convictions must be vacated. To punish Chavez three times for each separate offense clearly violates double jeopardy and the settled laws of this state. *See Baker*, 440 N.W.2d at 293.[4]

[¶ 19.] If, under the same set of facts, a defendant is wrongly convicted and sentenced under more than one subsection of SDCL 22–18–1.1, the erroneous convictions must be vacated by the trial court. *See id.* Accordingly, this case is remanded to the trial court to vacate the convictions

---

4. It should be noted that "[it] is permissible ... to charge in separate counts the commission of the same offense in different ways in order to meet the evidence which may be adduced." *State v. Teutsch*, 80 S.D. 462, 468, 126 N.W.2d 112, 115 (1964). Additionally, "if a defendant is convicted on two counts, relating to a single offense, a general sentence may be imposed." *Id.* Here, neither the sentencing transcript, nor the judgment and sentence, shows a general sentence was imposed in this case.

and sentences for the above-described four aggravated assault convictions.

[¶ 20.] 2) **Whether the evidence is sufficient to sustain the defendant's convictions.**

[¶ 21.] Next, Chavez claims the evidence at trial is insufficient to support his conviction. Chavez's sufficiency of the evidence argument is based around the varying versions of what happened on the night police executed their search warrant. He testified that he was reaching out the bedroom door to fire a shot into the ceiling as a means of scaring away those he allegedly thought were the victims of the robbery committed by Iboy and friends earlier that evening. Chavez testified that he had cracked the door and tried to fire into the ceiling, but that the gun wouldn't fire for some reason. He pulled the gun back into the room, readjusted, and stuck the gun back into the hall to try again to fire at the ceiling. Then, within a couple of seconds, the police allegedly saw the gun and fired at Chavez. Chavez claims he didn't remember firing, and he had an expert testify that he may have fired as a result of an involuntary muscle contraction caused by the severing of a nerve after police shot him. He claims he did not know the police were in his home, and that he did not intentionally fire his gun. In essence, Chavez argued that the grogginess of just awakening to screams of his wife, along with the use of medication and consumption of a few drinks several hours prior to the arrival of police made it difficult for him to comprehend what was going on. Because of his knowledge of the earlier robbery, he claims that, in his incoherent state, he was merely trying to protect his family from intruders he thought had been robbed by Iboy and the others that evening.

[¶ 22.] The State, however, provided testimony demonstrating that Chavez's pistol was heard firing before the P-90's shot could be heard. Additionally, Miller and Hagen testified that they were loudly calling out that they were the police, and that they had a warrant. Additional State testimony indicated that Chavez pointed at the officers as they approached the door, and that it did not appear to be the blind aim at the ceiling described by Chavez.

[¶ 23.] Here, we must view the evidence and its inferences most favorably towards upholding the verdict. *Gonzalez*, 2001 SD 47 at ¶ 7, 624 N.W.2d at 838. "We do not resolve conflicts in the evidence, pass on the credibility of the witnesses, determine the plausibility of an explanation, or weigh the evidence," *State v. Verhoef*, 2001 SD 58, ¶ 22, 627 N.W.2d 437, 442 (citing *State v. Karlen*, 1999 SD 12 ¶ 49, 589 N.W.2d 594, 605; *State v. White*, 1996 SD 67, ¶ 24, 549 N.W.2d 676, 682; *State v. Andrews*, 393 N.W.2d 76, 80 (S.D.1986); *State v. Blakey*, 332 N.W.2d 729, 731, (S.D.1983)). Under this standard, we cannot cast aside the jury's credibility determination. The jurors listened to both the prosecution's and the defense's version of events throughout a five-day jury trial. Chavez argues a version that presents a picture favorable to his position, but there was conflicting evidence that was shown to the jury, which it found more credible. Therefore, we affirm on this issue.

[¶ 24.] 3) **Whether the trial court erred by allowing the defendant only partial access to police manuals.**

[¶ 25.] Chavez had issued a subpoena duces tecum requesting the police department's procedure manuals. The City, however, claimed these manuals were confidential. Consequently, the trial court re-

viewed the materials in camera and gave the defense only the pertinent portions of the procedure manuals. This, Chavez argues, deprived him of the opportunity to adequately prepare a defense.

■■■ [¶ 26.] We must determine whether the trial judge was justified in its decision to permit only pertinent portions to be viewed by the defense. *Machmuller,* 2001 SD 82, ¶ 9, 630 N.W.2d 495, 498. The Eighth Circuit, in analyzing the federal Freedom of Information Act, has held that law enforcement materials involving methods of enforcing laws are solely the concern of law enforcement and need not be disclosed. *Hardy v. Bureau of Alcohol, Tobacco and Firearms,* 631 F.2d 653, 657–58 (9thCir.1980). Allowing the full disclosure of law enforcement manual may later "impede" an agency's "efforts to carry out its law enforcement responsibilities." *Cox v. Levi,* 592 F.2d 460, 461 (8thCir.1979) (discussing obligation to disclose FBI manuals under the Freedom of Information Act). Other courts have also determined that law enforcement manuals should not be disclosed. *Shay v. Mullen,* 215 A.D.2d 935, 626 N.Y.S.2d 580, 581–82 (1995) (holding issuance of writ of prohibition preventing prosecutors from disclosing alcohol test manuals was warranted based on confidentiality). If, however, a defendant finds that it is necessary to use portions of a law enforcement manual, he should set forth the "factual predicate" in his discovery request, and receive only that which is necessary; his request cannot be overbroad. *Constantine v. Leto,* 157 A.D.2d 376, 557 N.Y.S.2d 611, 613 (1990). If a subpoena duces tecum is over-broad, it may be quashed. *Id.*

[¶ 27.] Here, the defense, in its subpoena duces tecum, requested all "plans and policies" for carrying out a raid, and spanned from requesting information on the clothing worn by the officers to the ammunition supplied to the SWAT Team members. The trial court examined the manuals at issue, and gave Chavez portions of the operating procedure regarding the use of force and the use of interpreters for those who do not speak English. These sections were then used by the defense and entered into evidence at trial.

■■■ [¶ 28.] The trial court fairly handled this matter by giving the defense the opportunity to use pertinent portions of the manuals, while still respecting the rights of the police department to keep certain police tactics away from the public eye. Thus, we cannot find that the trial court's decision on this matter was against reason and evidence. We affirm on issue three.

[¶ 29.] 5) **Whether the trial court erred in admitting photographs of police reenactment events related to the shooting.**

[¶ 30.] Next, Chavez contends that the trial court erred in admitting photographs of a police reenactment of the crime scene on the night of the search warrant execution. He asserts that the photos were not accurate portrayals of the scene because the photos were taken in daylight rather than at night, which was when the crime occurred. He further contends that there were differences in the height and weight of the actors in the photos when compared to the real participants, and that the photos were "predicated on the recollection of the officers" and not on actual events.

■■■ [¶ 31.] "Photographs are generally admissible when they accurately portray anything that a witness could describe and when they provide an aid to a verbal description of relevant objects or conditions." *State v. Blue Thunder,* 466 N.W.2d 613, 621 (S.D.1991) (citations omitted). Relevant evidence of a crime scene has often been used in criminal trials.

*State v. Knecht,* 1997 SD 53, ¶ 11, 563 N.W.2d 413, 418 (stating that "it is hard to fathom how evidence of the crime scene could be characterized as irrelevant" and citing numerous cases supporting that statement).

[¶ 32.] The photographs at issue showed how the officers were positioned in Chavez's hallway, and showed the pattern of the bullets in Chavez's bedroom door through the insertion of dowels through bullet holes. At trial, the differences between the night of the crime and the images portrayed in the photographs were explained to the jury. The photographs were clearly used as a legitimate "aid to a verbal description of relevant objects or conditions." *Blue Thunder,* 466 N.W.2d at 621. Thus, the trial court did not abuse its discretion in admitting them.

[¶ 33.] **6)  Whether the trial court erred in its instructions to the jury.**

[¶ 34.] Chavez failed to cite to any supporting authority on this issue, or even discuss this in his brief. "The failure to cite supporting authority is a violation of SDCL 15–26A–60(6) and the issue is thereby deemed waived." *State v. Pellegrino,* 1998 SD 39, ¶ 22, 577 N.W.2d 590, 599 (quoting *State v. Knoche,* 515 N.W.2d 834, 840 (S.D.1994); *State v. Dixon,* 419 N.W.2d 699, 701 (S.D.1988)). This issue has been waived.

[¶ 35.] We find all other issues raised on appeal to be without merit.

[¶ 36.] For the foregoing reasons, we affirm in part and remand for a vacation of the surplus assault convictions on counts 1, 2, 5 and 6 in the judgment and sentence dated August 23, 2001.

[¶ 37.] GILBERTSON, Chief Justice, and KONENKAMP and ZINTER, Justices, concur.

[¶ 38.] SABERS, Justice, concurs in part and concurs specially in part.

SABERS, Justice (concurring in part and concurring specially in part).

[¶ 39.] This may be the most important criminal law case in South Dakota in years in respect to proper charging, instructing, convicting and sentencing. The majority opinion recognizes that it is not "permissible to punish a defendant more than once for one offense in violation of a single statute" and that "[t]he remaining four aggravated assault convictions must be vacated."

[¶ 40.] The majority opinion acknowledges at ¶ 16 that "the State concedes in its brief that the trial court should have only entered two convictions ... rather than six." Despite that clear language that the trial court erred and "wrongly convicted" Chavez four times, the majority opinion refuses to bite the bullet and REVERSE the trial court. It attempts to avoid the inevitable by simply "affirming in part" and remanding to vacate the "surplus assault convictions."

[¶ 41.] I respectfully submit that we must "bite the bullet" and tell the trial courts of this state that, at least from now on, they must do it right the first time or they will have to do it over until they do it right.

[¶ 42.] If the sentences are wrong and must be vacated, simple logic tells us that the convictions are wrong and must be vacated by reversal. Consequently, the instructions on which these convictions were based were wrong because they failed to clearly provide *in the alternative.* If the charges did not clearly provide *in the alternative,* they too were wrong, and the defendant has been improperly overcharged, and if prejudiced thereby, would deserve a new, fair trial.